MICHAEL SMITH,                    ]
                                 ]
       Plaintiff,                ]
                                 ]
v.                               ]        No. 3-09-0139
                                 ]        JUDGE HAYNES
                                 ]
C.R. BARD, INC.,                 ]
                                 ]
       Defendant.                ]

### M E M O R A N D U M

Plaintiff, Michael Smith, a Tennessee citizen, filed this action under 28 U.S.C. §§ 1331 and 1343 and under 28 U.S.C. § 1332, the federal diversity statute, against Defendant, C.R. Bard, Inc., a New Jersey corporation, asserting claims of retaliatory discharge under the False Claims Act, 31 U.S.C. § 3730(h), ("FCA"), the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304, ("TPPA"), Tennessee common law, and the Tennessee False Claims Act, Tenn. Code Ann. § 4-18-105, ("TFCA"). The gravamen of Plaintiff's claims is that Defendant terminated him in retaliation for his internal complaint against the Defendant's improper off-label promotion and sale of Tegress in men. Plaintiff alleges that he did not remain silent about the off-label marketing and complained on three occasions - on January 31, 2008, in a discussion with Gary Lickovitch, on March 10, 2008, in an email to Mark Downey, and on March 26, 2008, in an email to Geoff Gerks.

Before the Court is Defendant's motion for summary judgment (Docket Entry No. 73) and Plaintiff's motion for partial summary judgment (Docket Entry No. 72). In his motion, Plaintiff contends that as a matter of law Plaintiff was terminated and did not resign.

In its motion, Defendant contends that Plaintiff's state law claims fail because: (1) Plaintiff cannot show that he engaged in protected activities because his complaints did not further a public good nor involve the exercise of a statutory or constitutional right; (2) Plaintiff cannot establish that he was terminated; (3) Plaintiff lacks proof of the requisite causation under either the TPPA or common law; (4) Defendant had a legitimate, non-discriminatory reason to determine that Plaintiff had effectively resigned and that Plaintiff cannot show that Defendant's determination was pretextual; and (5) Plaintiff did not properly raise a TFCA claim, that such claim was abandoned and that the TFCA claim fails for the same reasons as his FCA claim. As to Plaintiff's FCA claim, Defendant contends that: (1) Plaintiff's proof fails on a subjective good faith and objectively reasonable belief that Defendant was committing a fraud against the government; (2) Plaintiff cannot prove that he suffered an adverse employment action; (3) Plaintiff cannot prove any causal connection between protected activity and any adverse employment action; and (4) Defendant had a legitimate, non-discriminatory reason to

2

determine that Plaintiff had effectively resigned and that Plaintiff cannot show that Defendant's determination was pretextual.

For the reasons set forth below, the Court concludes that Defendant's motion for summary judgment should be granted and Plaintiff's motion for partial summary judgment should be denied.

## I. FINDINGS OF FACT[1]

In 2000, Plaintiff began working for Bard Urological Division ("BUD"), a former division of Bard that later merged with Bard Medical Division in June 2009. Plaintiff was a Territory Manager ("TM"), assigned to the Nashville, Tennessee, territory that was part of the Southeast District. (Docket Entry No. 107, Plaintiff's response to Defendant's Statement of Undisputed Facts at ¶¶ 3, 13). BUD divided the country into eight sales districts that were headed by a District Manager ("DM"). Id. at ¶ 10. The districts, in turn, were sub-divided into territories that were assigned to individual TMs who traveled throughout the territory in an effort to meet, educate, and sell BUD products to current and potential

---

[1]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As will be discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Because there are not any material factual disputes, this section constitutes findings of fact under Fed. R. Civ. P. 56(d).

3

customers. Id. at ¶ 11. Each TM reported to a District Manager ("DM"), who was responsible for supporting, coaching, and evaluating the TM. Id. at ¶ 9. Plaintiff had three DMs: Chris Roman (2004-2006); Matt Lemay (2006-2007); and Ryan McKeon (2007-2008) during his last four years of employment. Id. at ¶ 14.

BUD offered products, services and education for the surgical treatment of prostate cancer, diseases and conditions of the urinary tract (including Endourological products for the treatment and management of kidney and other stones), female incontinence, and pelvic prolapse (including the Pelvic Floor category of products, which encompass synthetic and biological therapies used to repair female anatomy). Id. at ¶ 4. Tms sold these major product categories to physicians and hospitals until 2006. Id. at ¶ 6. The products for the treatment of female incontinence included Slings, a surgical therapy for the treatment of incontinence, and Bulking, non-surgical injectable therapies designed to prevent and treat incontinence. Id. at ¶ 5.

In January 2006, BUD divided its sales force into Women's Health and Urology and Men's Health. As a Women's Health TM, Plaintiff began selling exclusively Pelvic Floor, Slings, and Bulking products. Id. at ¶¶ 7-8. From April 2005 to January 2007, among the Bulking products for Women's Health, TMs sold Tegress, a synthetic injectable therapy for the treatment of stress urinary incontinence in women. Id. at ¶ 7. Tegress was approved by the

4

Food & Drug Administration ("FDA") for use in women. Id. at ¶ 77. Bard, however, did not seek FDA approval of Tegress for men. Id. at ¶ 78.

On or about December 19, 2006, BUD announced its cessation of Tegress sales effective January 31, 2007. Id. at ¶ 86. BUD's decision to stop selling Tegress was because Tegress sales did not achieve company expectations and a new technique made surgical treatment options more effective at treating incontinence, making synthetic injectable therapies less attractive. Id. at ¶ 87. BUD instructed its sales force that after January 31, 2007, to return all Tegress samples and return or destroy all Tegress marketing materials in their possession. Id. at ¶ 88. Plaintiff does not have any proof of BUD's Tegress sales after January 31, 2007. Id. at ¶ 90.

During Plaintiff's final four years of employment from 2004-2007, among non-rookie Tms, Plaintiff ranked 40/43; 27/41; 22/36; and 35/40, respectively. Id. at ¶¶ 15, 18, 22, 26, 31. With "overall" rankings that included rookies and territories without an assigned TM, Plaintiff ranked 53/60, 30/60, 23/53, and 38/53 during this same time period. Id. at ¶¶ 16, 18, 22, 26, 31. In 2004 Plaintiff missed his quota in four of five product categories and finished under the overall total quota, earning a "Needs Improvement" rating of his overall performance. Id. at ¶¶ 19-20. In 2005, Plaintiff failed to make his quota in three out of five

5

product categories as well as in the miscellaneous "All Other Products," earning a "Needs Improvement" rating (by then, the lowest possible rating) in all of those categories. Id. at ¶ 23. Plaintiff's DM noted that it was "the second year in a row in which [Plaintiff's] performance ha[d] been below the expectations of what [he] ha[d] witnessed in earlier years." Id. at ¶ 24.

In 2006, Plaintiff missed quota in two out of three product categories with the DM labeling Plaintiff's 2006 performance "a very average year." Id. at ¶¶ 27-28. In 2007, Plaintiff failed to achieve quota in all three product categories, earning a "Needs Improvement" in these categories, and lost over $300,000 in business. Id. at ¶ 32. Plaintiff rated himself as "Needs Improvement" on his overall rating, admitting that he need[ed] to step up [his] game." Id. at ¶ 36.

From January 21 to 23, 2008, Ryan McKeon, Plaintiff's District Manager, met with Plaintiff to discuss Plaintiff's performance and his need to improve. Id. at ¶ 37. In a January 25, 2008, letter to Plaintiff, McKeon summarized their discussions and stated: "Over the last three years you have had your struggles and you and I have discussed in depth some of the reasons. . . . You have to turn it on and work your territory with that same intensity and hunger that you had when you started at BUD." Id. at ¶ 39. McKeon also informed Plaintiff: "We will be closely assessing your progress together on a weekly basis to assure that you are on target. If you

6

are not trending to achieve your 2008 quota by the end of March 2008 we will then have to put an action plan in place to assist you in achieving your goals." Id. at ¶ 40.

From January 28 to January 31, 2008, Plaintiff attended Bud's 2008 National Sales Meeting ("NSM"). Id. at ¶ 91. As in every previous year, a Bard attorney presented a training on compliance with federal fraud and abuse laws and the Bard Ethics Policy, and Plaintiff attended this training, just as he had in the prior four years. Id. at ¶ 92. Bard's Ethics Policy emphasizes that employees are encouraged to report all suspected violations of governmental labeling laws. Id. at ¶¶ 70-71. One of the options discussed in the Ethics policy states that suspected compliance violations can be made anonymously to BUD's Compliance Hotline 24 hours a day, seven days a week. Id. at ¶ 72.

According to Plaintiff, one presentation at the NSM warned that the promotion and marketing of medical devices for off-label use was prohibited and advised, for the first time, that the Department of Justice was targeting sales representatives for prosecution. (Docket Entry No. 100, Smith Deposition at pp. 180-85; Docket Entry No. 101, Smith Deposition at pp. 52-53; Docket Entry No. 92, Selznick Deposition, Exhibit 13 at D001390). Plaintiff became concerned over the possibility that he could be criminally liable for marketing Tegress for off-label use. (Docket Entry No. 101, Smith Deposition at pp. 52-54). Plaintiff testified

7

that he previously thought the company might be liable, but did not believe that the sales representatives could be. Id. at p. 54.

Following this presentation, Plaintiff voiced his concerns to Gary Lickovitch, Regional Manager, stating, "I have some grave concerns about what I just heard. I feel that we have committed these things and that we have engaged in off-label use of Tegress for injection in males." (Docket Entry No. 99, Smith Deposition at pp. 116-17). Lickovitch did not manage Plaintiff's district nor directly supervise Plaintiff. (Docket Entry No. 83, Lickovitch Declaration at ¶¶ 3-4). According to Plaintiff, Lickovitch told Plaintiff to "Shut the fuck up," and that if Plaintiff did not, Lickovitch would "run [Plaintiff] out of the company" and that Plaintiff "need[ed] to be more worried about what [Lickovitch] [could] do to [Plaintiff's] career." (Docket Entry No. 99, at pp. 117-18).

Lickovitch disputes Plaintiff's allegation and states that Plaintiff did not mention any concerns regarding off-label marketing of Tegress before, during or after the 2008 NSM. (Docket Entry No. 83, at ¶ 6). Lickovitch also states that during the 2008 NSM, he did not argue, swear or threaten Plaintiff. Id.

On March 7, 2008, McKeon informed Plaintiff that he had drafted a Performance Improvement Plan ("PIP") and would deliver the plan to him no later than March 11, 2008. McKeon told Plaintiff that he wanted Plaintiff to fill out weekly call reports

8

that were designed to focus Plaintiff on his sales in a more detailed fashion. McKeon also told Plaintiff that they would begin holding weekly telephone calls to review his performance and assess Plaintiff's completion of the weekly call reports. (Docket Entry No. 77, McKeon Declaration at ¶ 11). By March 10, 2008, Plaintiff was failing to attain quota in two out of the three product categories and was on pace to attain only 76.5% of the overall quota. In the Pelvic Floor category that accounted for two-thirds of the overall 2008 quota, Plaintiff was at 56.9% of quota. (Docket Entry No. 107 at ¶ 97).

Plaintiff disputes that McKeon told him that a PIP would be implemented and denies knowledge of the plan to implement a PIP prior to his March 10, 2008, email to Mark Downey. (Docket Entry No. 108, Smith Declaration at ¶ 13). Plaintiff's March 10, 2008 email to BUD President Mark Downey asserted that BUD "may have been in violation of FDA rules for the marketing of Tegress for male incontinence due to radical prostatectomy." (Docket Entry No. 107 at ¶ 101). According to Plaintiff, "Gary Lickovitch was a vocal proponent in the sales management team for selling Tegress for use in males," and he raised these issues with Lickovitch on the last day of the 2008 NSM to which Lickovitch responded in an "aggressive and threatening" manner. Id. at ¶ 102. Plaintiff explained that his "concern as an employee and a shareholder [was] heightened given the meaningful amount of Bard performance related stock

9

options" that he had been awarded over his career with Bard and that he "thought it good business" to discuss his concerns directly with Lickovitch. (Docket Entry No. 81, Downey Declaration, Exhibit A).

Plaintiff further asserted that following his discussion with Lickovitch on January 31, 2008, Lickovitch and Bard executive staff: (1) questioned his expense reports; (2) stated that Plaintiff was "a cancer and will soon be out of Bard"; (3) asked his manager about his cell phone greeting that had not changed in eight years; (4) questioned the authenticity of doctor signatures on forms that Plaintiff had submitted; (5) threatened to monitor his computer; (6) directed his manager to have him submit weekly call reports, "presumably, as a first step towards a PIP; and (7) received a performance review on February 11, 2008, that stated "needs improvement." Id.

The next morning, March 11, 2008, Geoffrey Gerks, the Vice President of Human Resources, suspended implementation of the PIP. (Docket Entry No. 107 at ¶ 112). Gerks informed Plaintiff that "steps [were] being taken to fully investigate all of the allegations you recently raised" and as a result, BUD had "temporarily placed on hold the implementation of a Performance Improvement Plan that was planned and scheduled to be delivered prior to receipt of your email to Mark Downey dated March 10, 2008." Id. Gerks contacted corporate counsel, and Bard engaged

10

attorneys at Morgan Lewis & Bockius to investigate Plaintiff's allegations of off-label promotion of Tegress.[2] <u>Id</u>. at ¶ 113.

The day after his email to Downey, Plaintiff informed McKeon that he was taking a week of vacation from March 11 through March 14. <u>Id</u>. at ¶ 104. The following week (March 17-21, 2008), Plaintiff took a second week of vacation. <u>Id</u>. at ¶ 105. Plaintiff is unsure if he were on vacation the week of March 24-28, 2008, but he did not send a weekly call report to his supervisor. <u>Id</u>. at ¶ 106.

On March 26, 2008, Plaintiff emailed Gerks, stating his concerns about how Bard treated him since his discussion with Lickovitch on January 31, 2008. (Docket Entry No. 90, Gerks Deposition, Exhibit 16). Plaintiff stated:

> I have some grave concerns about the way I have been treated by the company since I expressed to Mr. Lickovitch on January 31, 2008 that I thought the company's promotion of the off label use (in men) of Tegress was a false claim (including a false certification to the FDA) by the company. I am pursuing a false claims act action and believe that I have been retaliated against by the company ever since January 31, 2008 and believe that this retaliatory conduct continues. . . .

---

[2]The Morgan Lewis investigation team was headed by Zane Memeger, a former Assistant United States Attorney. <u>Id</u>. at ¶ 115. The investigation into Plaintiff's allegations of the off-label promotion of Tegress, included reviewing thousands of documents and interviewing eleven people, including Plaintiff, other TMs, and BUD management. <u>Id</u>. at ¶ 116. The investigation took several months to complete with the firm concluding on June 24, 2008, that there was not any evidence supporting Plaintiff's allegation that TMs had been instructed or encouraged to promote Tegress off label. <u>Id</u>. at ¶¶ 128-29.

Id.

Plaintiff cancelled a doctor visit that he had scheduled for March 28 because of an alleged foot injury he sustained sometime earlier. (Docket Entry No. 107 at ¶ 108). Plaintiff then requested another week of vacation, from March 31, 2008 through April 4, 2008, and although this request was denied by McKeon, Plaintiff took that week off anyway. Id. at ¶ 111. On April 2 and 3, McKeon left several messages with Plaintiff that went unanswered. Id. at ¶ 134. Plaintiff explained that he was using his personal cell phone because his work cell phone had died and he was reachable by email on his computer and on the Audix system. Id.

On April 4, 2008, McKeon placed a call to Plaintiff on his company-issued phone to discuss Plaintiff's performance and a particular form that McKeon had requested him complete. Id. at ¶ 139. After this conversation, on April 7, 2008, McKeon sent an email to Gerks summarizing their conversation. Id. at ¶ 141. According to McKeon, Plaintiff stated that he was "finished working for Bard," he would not work his territory, he was cutting off communication with McKeon, and he would not go into his accounts anymore. Id. at ¶ 140.

According to McKeon, he asked Plaintiff, "[W]hy don't you just resign and do things the right way," and Plaintiff responded, "[N]o the first step that is going to take place is that [my] attorneys

12

will be sending a letter either today 4/4/2008 or on Monday 4/7/2008 stating that they are cutting off communications between [Plaintiff] and his direct reports." (Docket Entry No. 77, McKeon Declaration, Exhibit L). McKeon informed Plaintiff that "this could lead to [him] being terminated," and Plaintiff responded that he wanted them to terminate him so that he could "act on the Tennessee whistle blower law." Id. Plaintiff denies that he said he was finished working with Bard, that he was done with his territory and accounts, that he was cutting off communication with Bard and that he said to terminate him so that he could "act on the Tennessee whistle blower law." (Docket Entry No. 100, Smith Deposition at p. 318).

On April 8, 2008, Gerks emailed Plaintiff, stating that based on Plaintiff's conversation with McKeon, Bard was accepting Plaintiff's resignation. (Docket Entry No. 90, Gerks Deposition, Exhibit 12). On the same date, Plaintiff responded by email that he did not submit his resignation to McKeon and that he had spoken to several customers/prospects as well as Bard's Regional Vice President on various business related matters. Id., Exhibit 11. Plaintiff remarked, "Does this strike you as odd behavior for an employee that supposedly resigned on April 4[th]?" Id. Plaintiff stated that he did express his dissatisfaction to McKeon concerning Bard's handling of his complaint to Downey and that he relayed to McKeon that he had too much invested in his eight years at Bard to

13

resign without giving Bard the opportunity to address his concerns. Plaintiff concluded, stating that he would "continue [his] efforts to grow C.R. Bard's business in [his] territory." Id.

On April 9, 2008, Gerks responded via email stating that Bard did not accept Plaintiff's attempt to rescind his resignation. Id., Exhibit 13. Plaintiff responded on April 11, 2008, reiterating that he did not resign and stating that he considered himself terminated. (Docket Entry No. 75, Exhibit G).

Plaintiff testified that he first complained about the promotion of off-label use of Tegress in men to LeMay in 2006, stating that he could not "believe that [they were] pushing [Tegress] to the male market when it didn't work in the female market and [they] [didn't] have the FDA approval for it." (Docket Entry No. 99, Smith Deposition at pp. 104-05). Plaintiff testified that he made similar complaints to DM Tad Nations in 2006, Downey in 2006, sales representative Trey Tolbert in 2006-2007, and TM Hillary Kunda in 2007. Id., at pp. 107-08, 112-13, 120-125.

Plaintiff testified that prior to 2008, TM Jason Selznick, TM Hillary Kunda, and DM Tad Nations also complained about off label marketing of Tegress, yet admits that they were not run out of the company because of those complaints. (Docket Entry No. 107 at ¶ 148). Jason Selznick testified that he did not complain to anyone that others were promoting Tegress for off-label purposes. Id. at ¶ 149. Selznick further testified that his employment with BUD

14

ended June 22, 2009, when he along with 50% of the BUD sales force was laid off as part of a merger of divisions. Id. at ¶ 150. Tad Nations testified that he too was displaced by the merger of divisions in June 2009. Id. at ¶ 151. Hillary Kunda testified that she was not fired but, rather, had her position eliminated. Id. at ¶ 152.

## II. CONCLUSIONS OF LAW

"The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment *sua sponte*, so long as the opposing party was on notice that [he] had to come forward with all of [his] evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986); accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere

15

existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.

<u>As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.</u> Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'" <u>Matsushita Electrical Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. <u>Celotex</u>, 477 U.S. at 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. <u>Emmons v. McLaughlin</u>, 874 F.2d 351, 355-57 (6th Cir. 1989). <u>But</u> <u>see</u> <u>Routman v. Automatic Data Processing, Inc.</u>, 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties, as described by the Court in <u>Celotex</u>:

16

> Of course, a party seeking summary judgment always bears
> the initial responsibility of informing the district
> court of the basis for its motion, and identifying those
> portions of "the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with
> the affidavits, if any," which it believes demonstrate
> the absence of a genuine issue of material fact. . . .
> [W]e find no express or implied requirement in Rule 56
> that the moving party support its motion with affidavits
> or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991)(quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of `demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving party then `must set forth specific facts showing that there is a genuine issue for trial.'" Emmons, 874 F.2d at 353 (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the United States Court of Appeals for the Sixth Circuit warned that "the respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479

17

(6th Cir. 1989)(quoting <u>Liberty Lobby</u>).  Moreover, the Court of

Appeals explained that:

> The respondent must "do more than simply show that there
> is some metaphysical doubt as to the material facts."
> Further, "[w]here the record taken as a whole could not
> lead a rational trier of fact to find" for the
> respondent, the motion should be granted.  The trial
> court has at least some discretion to determine whether
> the respondent's claim is "implausible."

<u>Street</u>, 886 F.2d at 1480 (citations omitted).  <u>See also</u> <u>Hutt v.</u>

<u>Gibson Fiber Glass Products</u>, 914 F.2d 790, 792 (6th Cir. 1990) ("A

court deciding a motion for summary judgment must determine

`whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party

must prevail as a matter of law.'") (quoting <u>Liberty</u> <u>Lobby</u>).

If both parties make their respective showings, the Court then

determines if the material factual dispute is genuine, applying the

governing law.

> More important for present purposes, <u>summary judgment</u>
> <u>will not lie if the dispute about a material fact is</u>
> <u>"genuine," that is, if the evidence is such that a</u>
> <u>reasonable jury could return a verdict for the nonmoving</u>
> <u>party</u>.
>
> .  .  .  .
>
> Progressing to the specific issue in this case, we are
> convinced that <u>the inquiry involved in a ruling on a</u>
> <u>motion for summary judgment or for a directed verdict</u>
> <u>necessarily implicates the substantive evidentiary</u>
> <u>standard of proof that would apply at the trial on the</u>
> <u>merits</u>.  If the defendant in a run-of-the-mill civil case
> moves for summary judgment or for a directed verdict
> based on the lack of proof of a material fact, <u>the judge</u>
> <u>must ask himself not whether he thinks the evidence</u>
> <u>unmistakably favors one side or the other but whether a</u>

18

<u>fair-minded jury could return a verdict for the plaintiff</u>
<u>on the evidence presented</u>.    The  mere  existence  of  a
scintilla  of  evidence  in  support  of  the  plaintiff's
position will be insufficient; there must be evidence on
which the jury could reasonably find for the plaintiff.
<u>The judge's inquiry, therefore, unavoidably asks whether</u>
<u>reasonable  jurors  could  find  by  a  preponderance  of  the</u>
<u>evidence that the plaintiff is entitled to a verdict --</u>
<u>"whether  there  is  [evidence]  upon  which  a  jury  can</u>
<u>properly  proceed  to  find  a  verdict  for  the  party</u>
<u>producing it, upon whom the onus of proof is imposed."</u>

<u>Liberty Lobby</u>, 477 U.S. at 248, 252 (citation omitted and emphasis

added).

> It is likewise true that:
> In ruling on [a] motion for summary judgment, the court
> must construe the evidence in its most favorable light in
> favor of the party opposing the motion and against the
> movant.   Further, the papers supporting the movant are
> closely   scrutinized,   whereas   the   opponent's   are
> indulgently  treated.    It  has  been  stated  that:  `The
> purpose of the hearing on the motion for such a judgment
> is not to resolve factual issues.   It is to determine
> whether there is any genuine issue of material fact in
> dispute. . . .'

<u>Bohn Aluminum & Brass Corp. v. Storm King Corp.</u>, 303 F.2d 425, 427

(6th  Cir.  1962)  (citation  omitted).    As  the  Court  of  Appeals

stated,  "[a]ll facts and inferences to be drawn therefrom must be

read  in  a  light  most  favorable  to  the  party  opposing  the  motion."

<u>Duchon v. Cajon Co.</u>, 791 F.2d 43, 46 (6th Cir. 1986).

The Sixth Circuit further explained the District Court's role

in evaluating the proof on a summary judgment motion:

> A district court is not required to speculate on which
> portion of the record the nonmoving party relies, nor is
> it obligated to wade through and search the entire record
> for some specific facts that might support the nonmoving
> party's   claim.    Rule  56  contemplates  a  limited
> marshalling of evidence by the nonmoving party sufficient

19

to establish a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986).

Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). Here, the parties have given some references to the proof upon which they rely. Local Rules 56.01(b)-(d) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

20

5.   A court should apply a federal directed verdict standard in ruling on a motion for summary judgment.   The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

6.   As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.   The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.   The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9.   The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.   The trial court has more discretion than in the "old era" in evaluating the respondent's evidence.   The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts."   Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted.   The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1479-80 (citations omitted).

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present

21

sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

## A. TPPA AND COMMON LAW CLAIMS

Tennessee has long recognized the employment at-will doctrine, under which the "concomitant right of either the employer or the employee to terminate the employment relationship at any time, for good cause, bad cause, or no cause at all, without being guilty of a legal wrong." Stein v. Davidson Hotel Co., 945 S.W.2d 714, 716 (Tenn. 1997). Tennessee courts also recognize exceptions to this doctrine: "In Tennessee an employee-at-will generally may not be discharged for attempting to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy which is evidenced by an unambiguous constitutional, statutory, or regulatory provision." Id. at 717. These exceptions attempt to strike a balance between "the employment-at-will doctrine and rights granted employees under well-defined expressions of public policy." Id. Thus, "the tort action of retaliatory or wrongful discharge is available to employees discharged as a consequence of an employer's violation of a clearly expressed public policy." Id. To be sure, the Tennessee Supreme Court has "emphasized that the

22

exception to the employment-at-will doctrine must be narrowly applied and not be permitted to consume the general rule." Id. at 717 n.3 (citing Chism v. Mid-South Milling Co., 762 S.W.2d 552, 556 (Tenn. 1988)).

To establish a retaliatory discharge claim under the common law, a plaintiff must prove the following:

> (1) that an employment-at-will relationship existed; (2) that the employee was discharged, (3) that the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy.

Crews v. Buckman Laboratories Int'l, Inc., 78 S.W.3d 852, 862 (Tenn. 2002) (citations omitted).

As to its role in discerning public policy, the Tennessee Supreme Court has stated:

> This Court can know nothing of public policy except from the constitution and the laws, and the course of administration and decision. It has no legislative powers. It cannot amend or modify any legislative acts. It cannot examine questions as expedient or inexpedient, or as politic or impolitic. Considerations of that sort must, in general, be addressed to the legislature. Questions of policy determined there are concluded here.
>
> There are cases, it is true, in which arguments drawn from public policy must have large influence; but these are cases in which the course of legislation and administration do not leave any doubt upon the question what public policy is, and in which what would otherwise be obscure or of doubtful interpretation, may be cleared and resolved by reference to what is already received and established.

23

<u>Stein</u>, 945 S.W.2d at 717 (quoting <u>Nashville Ry. & Light Co. v.</u> <u>Lawson</u>, 144 Tenn. 78, 91, 229 S.W. 741, 744 (1920) (with other citation omitted)). Tennessee courts do not "engage in hypothetical guessing to fashion public policy," nor do they "attempt to discern public policy from the common law." <u>Id</u>.

In addition to a common-law action for retaliatory discharge, the TPPA, commonly referred to as the "Whistleblower Act," Tenn. Code Ann. § 50-1-304(a), provides that an employee shall not be discharged solely for refusing to participate in or to remain silent about illegal activities. Tenn. Code Ann. § 50-1-304(b). "Illegal activities" include activities that are in violation of state or federal criminal or civil codes or any regulation intended to protect the public health, safety or welfare. Tenn. Code Ann. § 50-1-304(a)(3). To establish a retaliatory discharge claim under the TPPA, a plaintiff must prove that (1) he was an employee; (2) he refused to participate in, or to remain silent about, illegal activities; (3) he was terminated by his employer; and (4) there is an exclusive causal relationship between the plaintiff's refusal to participate in or remain silent about illegal activities and his termination. <u>Sykes v. Chattanooga Housing Auth.</u>, No. E2008-00525-COA-R3-CV, 2009 WL 2365705, at *11 (Tenn. Ct. App. July 31, 2009).

Thus, the first three elements of statutory retaliatory discharge are identical to the elements of the common-law claim.

24

Bright v. MMS Knoxville, Inc., No. M2005-2668-COA-R3-CV, 2007 WL 2262018, at *3 (Tenn. Ct. App. Aug. 7, 2007); Moray v. Novartis Pharmaceuticals Corp., No. 3:07-cv-1223, 2009 WL 82471, at *7 (M.D. Tenn. Jan. 9, 2009). However, "[t]he fourth element differs from the common law in that, to benefit from statutory protection, an employee must demonstrate that his or her refusal was the *sole* reason for his or her discharge." Bright, 2007 WL 2262018, at *3 (citing Guy v. Mut. of Omaha Ins. Co., 79 S.W.3d 528, 535-37 (Tenn. 2002)) (emphasis added).

Courts often analyze statutory and common law whistleblower claims together. See, e.g., Bright, 2007 WL 2262018, at *3-5; Williams v. Columbia Hous. Auth., No. M2007-1379-COA-R3-CV, 2008 WL 4426880, at *3-5 (Tenn. Ct. App. Sept. 30, 2008); Moray, 2009 WL 82471, at *7-12; Treadaway v. Big Red Powersports, LLC., 611 F. Supp.2d 768, 783 (E.D. Tenn. 2009). In analyzing a whistleblower case, a court is

> not limited to a determination of whether a law or regulation was violated, Guy v. Mut. of Omaha Ins. Co., 79 S.W.3d at 538, and, indeed, an employee's actions will not qualify him or her for protection merely because the employee has pointed out an illegal activity. Franklin v. Swift Trans. Co., 210 S.W.3d 521, 530-31. It is the court's task to determine whether the whistleblowing activity that brought to light an illegal or unsafe practice has furthered an important public policy interest. Guy, 79 S.W.3d at 538. Toward that end, it is essential that the employee's attempt to expose illegal or unsafe practices do more than merely advance the employee's private interest. Guy, 79 S.W.3d at 538 n. 4. Furthermore, while an employee need not report suspected illegal activities directly to law or regulatory enforcement officials, Emerson v. Oak Ridge Research,

> Inc., 187 S.W.3d 364, 371 & n. 1 (Tenn. Ct. App. 2005),
> an employee must make a report to some entity other than
> the person or persons who are engaging in the allegedly
> illegal activities. Id.

Bright, 2007 WL 2262018, at *4.

If a plaintiff establishes a prima facie case under the TPPA or common law, based on direct or circumstantial evidence, showing a causal relationship between plaintiff's refusal to participate in or to remain silent about an illegal activity and the employer's decision to terminate the employee, the burden shifts to the defendant to come forward with a legitimate, nondiscriminatory reason for its actions. Provonsha v. Studs. Taking a Right Stand, Inc., No. E2007-469-COA-R3-CV, 2007 WL 4232918, at *4 (Tenn. Ct. App. Dec. 3, 2007). If the defendant articulates such a reason, the burden of proof shifts back to the plaintiff to show that defendant's proffered reasons are pretextual or not worthy of belief. Id. "To meet this burden, plaintiff must show by admissible evidence either '(1) that the proffered reason has no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate the discharge.'" Id. (citation omitted).

Defendant argues that Plaintiff cannot prove three of the four elements in his state law claims, contending that Plaintiff cannot show that he engaged in protected activities because his "complaints" did not further a "public good;" that he was terminated; or Plaintiff's proof lacks the requisite level of

26

causation under either the TPPA or common law. Assuming that Plaintiff carries his burden, Defendant argues that a legitimate, non-discriminatory reason existed for its actions and Plaintiff cannot present any evidence of pretext. Based upon Plaintiff's deposition testimony disputing that he resigned, the Court concludes that a material factual issue exists on whether Plaintiff resigned or was fired. The Court next addresses the other two elements of Plaintiff's prima facie case.

Defendant also contends that Plaintiff's actions did not constitute efforts to bring to light an illegal or unsafe practice that furthered an important public policy interest because Plaintiff acted merely to advance his private interest. See Guy v. Mut. of Omaha Ins. Co., 79 S.W.3d 528, 538 n. 4. (Tenn. 2002). ("[U]nder both the statute and the common law, the plaintiff must assert that his or her whistleblowing activity 'serves a public purpose [that] should be protected. So long as employees' actions are not merely private or proprietary, but instead *seek to further the public good*, the decision to expose illegal or unsafe practices should be encouraged.'" (citation omitted); Collins v. AmSouth Bank, 241 S.W.3d 879, 885 (Tenn. Ct. App. 2007). Defendant cites Bright v. MMS Knoxville, Inc. for support.

In Bright the plaintiff, a technician who delivered oxygen machines to patients, reported a patient's smoking to the manager of her retirement community. 2007 WL 2262018, at *1. The

27

plaintiff was concerned that he or his employer could be held liable if the patient were injured. Id. The patient complained to the plaintiff's employer, the employer terminated the plaintiff's employment, and the plaintiff sued, asserting both a TPPA and common law claim for retaliatory discharge. Id. at *2.

The court noted the existence of state and local regulations to curtail the dangers of smoking in retirement communities and nursing homes and that the plaintiff's actions "stemmed from a good faith attempt to prevent a safety hazard." Id. at *4, 5. However, the court stated that "it [was] hard to reconcile [the plaintiff's] claim for whistleblower status" because the plaintiff "testified that his 'legal concern' was that he or [his employer] could incur liability for any damage caused by [the patient's] smoking." Id. at *5. The court concluded, "The circumstances of this case present a well-intentioned employee who sought to avoid legal responsibility for a potentially hazardous situation. This simply does not fall within the scope of the protection provided by the statutory or common-law actions for retaliatory discharge." Id.

In response Plaintiff cites Vancleave v. Reelfoot Bank, No. W2008-01559-COA-R3-CV, 2009 WL 3518211 (Tenn. Ct. App. Oct. 30, 2009). However, Plaintiff's reliance on Vancleave is misplaced. Vancleave attempted to clarify the Tennessee Supreme Court's "statement in Guy, paraphrased in Collins, [that] may be interpreted as requiring a plaintiff in a retaliatory discharge

28

case to show subjective intent to further the public good." Id. at
*7.  The court explained that retaliatory discharge claims include
claims involving a refusal to remain silent, i.e. "whistleblower"
claims, and those involving a refusal to participate in illegal
activities.  Id.  The court concluded, "To the extent that the
statement in Guy, relied on in Collins, can be read as requiring
that the plaintiff's reporting of the illegal activity be motivated
by a desire to further the public good, such a statement of the law
would be limited to a whistleblowing claim." Id. at *8.  Because
the plaintiff in Vancleave had asserted retaliatory discharge for
refusal to participate in illegal activities, the court found that
the plaintiff was not required to demonstrate a subjective intent.
Id.  Thus, because Plaintiff is asserting a "whistleblowing" claim,
i.e. refusal to remain silent, the Court concludes Vancleave is
inapplicable and Guy, Collins, and Bright control the Court's
analysis.

    Here the undisputed facts reveal that Plaintiff acted merely
for private reasons and was not seeking "to further the public
good."  Plaintiff testified that the reason he came forward was
because he learned of the possibility of sales representatives
being held criminally liable.  Also, in his email to Downey,
Plaintiff stated that he was concerned "as an employee and a
shareholder" with a "meaningful amount of . . . stock options" and
that he "thought it good business" to discuss his concerns directly

29

with Lickovitch. Further, Defendant had stopped selling Tegress in January 2007, a year before his discussion with Lickovitch. The timing of Plaintiff's actions and his reasons given show that he was acting based on private concerns. See Treadaway, 611 F. Supp.2d at 783 (emphasis in original) (in granting summary judgment on TPPA and common law whistleblowing claim the court stated, "In her deposition, Plaintiff conceded her only purpose in discussing the CO issue with Defendant was to inform them about her *personal* concern for her fetus-not about her concern for the safety of others who worked in or patronized Defendant's facility.").

In an attempt to demonstrate that Plaintiff was not only protecting his private interests but was also seeking the public good, Plaintiff cites his Declaration where he states: "In making these complaints, I was seeking to further the public's protection from the dangers inherent from using products in a manner that had not been FDA approved and to stop fraudulent claims from being submitted to the government." (Docket Entry No. 108, Smith Declaration at ¶ 8). Plaintiff's declaration directly contradicts his deposition testimony that follows:

> Q. Why in 2007 didn't you step forward after this national sales meeting and you had this conversation with the other reps and you talked about how the company might be doing this? Why didn't you report that then?
>
> A. We didn't think that the reps would be liable. Nobody had really come after the reps in our industry yet for this practice, which a lot of companies had done. And in 2008 at the national sales meeting, during the ethics presentation they mentioned Medtronic and the FDA

30

off-label cases of them and Guidant how reps had been actually dragged in and arrested and prosecuted for the -- not only the company but actually the reps themselves. And that was the first time that we found out. We said, "Holly cow, as reps we're liable, not just the company."

Q. So your explanation as to why you made the report in 2008 versus 2007 is because in 2008 for the first time it was brought to your attention that you might have personal liability; is that right?

A. Correct.

Q. Other than that there is no other reason that you didn't make the report in 2007?

A. We didn't think that we were liable as reps, that the company might have been. And none of us wanted to get involved. . . .

(Docket Entry No. 101, Smith Deposition at pp. 53-54).

"A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." Hall v. Wal-Mart Stores East, LP, 637 F. Supp. 2d 558, 591 n.2 (M.D. Tenn. 2009) (quoting Reid v. Sears, Roebuck & Co., 790 F.2d 453, 460 (6th Cir. 1986)). Accordingly, the Court does not consider the cited portion of Plaintiff's declaration.

Moreover, Plaintiff has failed to prove the causation element under either the TPPA or common law. "'Evidence of causation requires more than the facts showing employment, the exercise of rights, and a subsequent discharge. It requires direct evidence or compelling circumstantial evidence. The plaintiff's mere belief or understanding of why he was dismissed, is not sufficient to create

31

a genuine issue of material fact.'" Provonsha, 2007 WL 4232918, at *5-6 (citing McCain v. Airport Honda, No. 03A01-9603-CV-00099, 1996 WL 557794 (Tenn. Ct. App. Oct.2, 1996)) (citations and internal quotation marks omitted). Plaintiff has not presented any direct or circumstantial evidence that any alleged protected activity was the sole reason or a substantial factor for his alleged termination.

Defendant stopped the implementation of the PIP in response to Plaintiff's email to Downey. Defendant also retained an outside law firm to conduct an investigation of Plaintiff's complaints. Further, it should be noted that Plaintiff testified that he had complained about off-label promotion of Tegress in men prior to 2008 and the Defendant did not take any adverse action against him. Moreover, Plaintiff testified that Selznick, Nations, and Kunda also made similar complaints prior 2008 and none were retaliated against. Selznick and Nations left Bard in a June 2009 reduction in force that was part of a larger corporate transaction and Kunda was laid-off when her position was eliminated. These facts undermine Plaintiff's burden of proving causation as these employees, who allegedly engaged in the same protected activity, did not suffer any adverse employment action.

In his brief, Plaintiff relies strictly on temporal proximity to prove causation, citing Allen v. McPhee, 240 S.W.3d 803, 823 (Tenn. 2007). However, Plaintiff's reliance on Allen is misplaced.

32

<u>Allen</u> pertained to a retaliation claim brought pursuant to the Tennessee Human Rights Act ("THRA"), not the TPPA or common law, where the plaintiff was required to show only "a causal connection between the protected activity and the materially adverse action" as opposed to the sole/substantial factor standard under the TPPA and common law.

Further, in <u>Mason v. Seton</u>, 942 S.W.2d 470 (Tenn. 1997) the Tennessee Supreme Court, addressing a TPPA claim, stated that "proximity in time between the protected act and the discharge is not sufficient to establish a causal relationship." <u>Id</u>. at 473 (citing <u>Conatser v. Clarksville Coca-Cola</u>, 920 S.W.2d 646, 648 (Tenn. 1995) (in rejecting common law retaliatory discharge claim based on plaintiff's discharge three days after filing a workers' compensation claim, the Court found plaintiff could not establish causation by relying solely on temporal proximity)). Moreover, in a case involving a common law retaliatory discharge claim, the Sixth Circuit stated, "The dissent's reliance on the Tennessee Supreme Court's later decision in <u>Allen v. McPhee</u>, 240 S.W.3d 803, 823 (Tenn. 2007), is misplaced here because the Tennessee Supreme Court had already decided the issue in <u>Conatser</u> and therefore <u>Allen</u> is not instructive in this respect." <u>Ellis v. Buzzi Unicem USA</u>, No. 07-5660, 293 Fed. Appx. 365, 375 (6th Cir. 2008); <u>see</u> <u>also</u> <u>Thompson v. Ameritech Advertising Servs.</u>, 40 Fed. Appx. 90, 93 (6th Cir. 2002) (finding that "any inference of causation that might be

33

drawn from temporal proximity" was undermined by the fact that "none of the other three employees who [engaged in the protected activity] have suffered any adverse action.").

Accordingly, for these reasons, the Court concludes that Plaintiff has failed to meet his burden of proving causation under the common law and the TPPA.

Because the common-law and the statutory retaliation claims require proof that the employee was actually discharged, Plaintiff's other allegedly retaliatory actions, including scrutinizing of his expense reports, questioning the authenticity of doctors' signatures on sales orders, questioning his voicemail greeting, directing him to submit weekly call reports, and publicly ridiculing him and calling him a "cancer" are not actionable. Turner v. Liberty Nat. Life Ins. Co., 488 F.Supp.2d 672, 677-78 (M.D. Tenn.2007); Moray, 2009 WL 82471, at *7.

### B. FCA CLAIM

Plaintiff asserts a claim under 31 U.S.C. § 3730(h) (1994) that provides, in pertinent part:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

34

<u>Id</u>.[3]

To state a claim, Plaintiff must establish that (1) he engaged in protected activity; (2) Bard knew about his protected activity; (3) Bard took adverse employment actions against him; and (4) there was a causal connection between the adverse employment actions and the protected activity. <u>Scott v. Metro. Health Corp.</u>, 234 Fed. Appx. 341, 346 (6th Cir. 2007).

Defendant contends that Plaintiff cannot make a prima facie showing that he had a good-faith belief that Defendant was engaged in fraud or that there was any causal connection between protected activity and any adverse employment action and that Defendant had a legitimate, nonretaliatory reason for deeming Plaintiff to have resigned and Smith is unable to show that this reason is pretextual.

"[A]n employee engages in protected activity where (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government." <u>Moore v. California Institute of Technology Jet Propulsion Lab.</u>, 275 F.3d

---

[3]In a recent amendment to the FCA entitled "Clarifications to the False Claims Act to Reflect the Original Intent of the Law," subsection (h) was amended to state that "the lawful acts done by the [plaintiff]" must be done "in furtherance of other efforts to stop 1 or more violations of this subchaper." Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1621, 1624-25 (2009). However, this amendment took effect on May 20, 2009, and applies only to conduct on or after May 20, 2009.

35

838, 845 (9th Cir. 2002); <u>Fanslow v. Chicago Mfg. Ctr.</u>, 384 F.3d 469, 480 (7th Cir. 2004); <u>Thompson v. Quorum Health Resources, LLC</u>, No. 1:06-CV-168, 2010 WL 234801, at *3 (W.D. Ky. Jan. 13, 2010). Thus, there is a subjective and an objective component for assessing whether an activity is protected conduct under the FCA.

"[T]he 'protected activity' must relate to 'exposing fraud' or 'involvement with a false claims disclosure.' An employee, however, need not expressly know that the FCA allows *qui tam* actions to be filed against their employer, or have already filed such an action to be protected from retaliation under § 3730(h)." <u>McKenzie v. Bellsouth Telecomms., Inc.</u>, 219 F.3d 508, 516 (6th Cir. 2000) (citation omitted). Therefore, a court must inquire into whether a plaintiff's actions sufficiently furthered "'an action filed or to be filed under' the FCA and, thus, equated to 'protected activity.'" <u>Id</u>. (citation omitted). A "protected activity" is defined as that activity that reasonably could lead to a viable FCA action. <u>Id</u>. A plaintiff "need not use formal words of 'illegality' or 'fraud,' but must sufficiently allege activity with a nexus to a *qui tam* action, or fraud against the United States government." <u>Id</u>. "Although internal reporting may constitute protected activity, the internal reports must allege fraud on the government." <u>Id</u>.

Whether the protected activity was taken "in furtherance of" an FCA enforcement action "requires consideration of (1) the type

36

of activity [the plaintiff] engaged in, and (2) [the plaintiff's] purpose in engaging in the activity." Perius v. Abbott Labs., No. 07 C 1251, 2009 WL 1851151, at *6 (N.D. Ill. June 26, 2009). "Because the purpose of the statute was to 'assure those who may be considering exposing fraud that they are legally protected from retaliatory acts,' the statute requires that a plaintiff's purpose involve 'at least some ingredient of uncovering fraudulent activity.'" Id.

In McKenzie, the plaintiff alleged that the defendant telephone company falsified reports to avoid having to make refunds to the United States and other customers. 219 F.3d 508. In its analysis, the Sixth Circuit stated:

> In United States ex rel. Hopper v. Anton, 91 F.3d 1261 (9th Cir. 1996), the Ninth Circuit found that an employee who wrote seventy letters and made fifty phone calls to government authorities to force her school district to comply with Federal and California regulations was not engaged in furthering an action under the FCA and, thus, not engaged in protected activity. See 91 F.3d at 1269. In U.S. ex rel. Yesudian v. Howard Univ., 153 F.3d 731 (D.C. Cir. 1998), however, the D.C. Circuit found that an employee who wrote numerous memorandums to the vice president of a university, detailing fraud allegations in a purchasing department connected to federal government-based procurement, and who met with the vice president to deliver additional proof of fraud in procurement, was engaged in protected activity under the FCA. See 153 F.3d at 740. The Yesudian court noted that the university employee, unlike the plaintiffs in Robertson v. Bell Helicopter Textron, Inc., 32 F.3d 948 (5th Cir. 1994) and Hopper, investigated fraud outside of the scope his employment and was not merely urging compliance with regulations but detailing fraudulent practices. . . .

Unlike the plaintiff in <u>Yesudian</u>, McKenzie has not taken action in furtherance of a *qui tam* action under the FCA. When McKenzie brought her complaints to the attention of the BellSouth auditor and her supervisors, legal action was not a reasonable or distinct possibility. Although the newspaper article distributed and posted by McKenzie shows awareness of consumer fraud, the "in furtherance of" language requires more than merely reporting wrongdoing to supervisors. <u>See Eberhardt v. Integrated Design & Const. Inc.</u>, 167 F.3d 861, 868 (4th Cir. 1999) (holding that merely reporting concerns of mischarging a government project or investigating an employer's non-compliance with federal or state regulations was insufficient to constitute "protected activity" under the FCA ); <u>Zahodnick v. International Bus. Machs. Corp.</u>, 135 F.3d 911, 914 (4th Cir. 1997); <u>Yesudian</u>, 153 F.3d at 740. <u>But see Mikes v. Strauss</u>, 889 F. Supp. 746, 753 (S.D.N.Y. 1995) (finding that plaintiff's observation and investigation outside scope of employment coupled with confronting employer with evidence of mischarging Medicare patients was sufficient to establish FCA claim). In the present case, McKenzie's repeated refusals to falsify repair records and numerous complaints to supervisors are not sufficiently connected to exposing fraud or false claims against the federal government. Absent the newspaper article describing a similar qui tam claim or fraud against the federal government, McKenzie's alleged protected activities consisted of refusing to falsify records which she knew were internal records used to determine refunds for BellSouth customers. Although McKenzie's deposition testimony shows that she knew these refunds included government and consumer BellSouth customers, they do not establish the necessary nexus to a potential FCA-based *qui tam* action. Assuming that McKenzie's falsification complaints have merit and that she understood that BellSouth's consumers were potentially being defrauded, her numerous complaints on the matter were directed at the stress from and pressure to falsify records, not toward an investigation into fraud on the federal government.

<u>Id</u>. at 516-17 (citations and footnote omitted).

Here, Plaintiff's actions were not sufficiently connected to exposing fraud or false claims against the federal government. Bard had stopped selling Tegress in January 2007. From 2005 to

38

2007 Plaintiff did not complain that Bard was defrauding the government. As stated previously, Plaintiff was concerned about possible personal liability and was not seeking to expose any alleged fraud on the government. Although Plaintiff states that he was pursuing "a false claims act action" in his March 26, 2008, email to Gerks, this statement is in reference to Plaintiff's complaint of alleged retaliatory conduct stemming from his concerns he allegedly expressed to Lickovitch that the promotion of the off-label use of Tegress was "a false claim (including a false certification to the FDA) by the company." Thus, the purpose of Plaintiff engaging in this activity was based on his concern over possible personal liability, not exposing fraud. Moreover, "a violation of a law or a regulation standing alone is not proof of a false claim." Hopper, 91 F.3d at 1270; Luckey v. Baxter Healthcare Corp., 2 F. Supp.2d 1034, 1045 (N.D. Ill. 1998) ("the FCA is not a vehicle for regulatory compliance ... [and] the FCA is not designed to punish every type of fraud committed upon the government"); Moor-Jankowski v. Board of Trustees of New York Univ., No. 96 Civ. 5997, 1998 WL 474084, at *12 (S.D.N.Y. Aug. 10, 1998).

Further, the Court concludes that Plaintiff's proof fails to show he had an objective basis to believe Defendant conducted a fraud on the government. Physicians may prescribe drugs for off-label uses at their discretion. See 21 U.S.C. § 396. Allowing

39

physicians to prescribe drugs for such "off-label" usage "is an accepted and necessary corollary of the FDA's mission to regulate [pharmaceuticals] without directly interfering with the practice of medicine." Buckman Co. v. Plaintiff's Legal Comm., 531 U.S. 341, 350 (2001). Although physicians may prescribe drugs for off-label use, the FDA prohibits drug manufacturers from marketing or promoting a drug for a use that the FDA has not approved. See 21 U.S.C. § 331(d).

Here Plaintiff failed to identify any doctors who prescribed Tegress off-label because of any illegal promotion by a Bard TM or that any alleged off-label use, due to a TM's off-label promotion, resulted in a fraud on the government.

Accordingly, Plaintiff's FCA fails.

### C. TFCA CLAIM

Plaintiff did not cite his TFCA claim along with the rest of his claims in paragraph 1 of his Complaint. Nor did Plaintiff cite the TFCA claim as a theory of recovery in his proposed case management order (Docket Entry No. 35) that was entered by the Court. See (Docket Entry No. 37). Accordingly, the Court deems this claim abandoned. See Dickson v. Sizemore Sec. Intern., Inc., No. 3:06cv0886, 2007 WL 2903906, at *7 (M.D. Tenn. Oct. 3, 2007).

### III. CONCLUSION

Accordingly, Defendant's motion for summary judgment (Docket Entry No. 73) should be granted and Plaintiff's motion for partial summary judgment (Docket Entry No. 72) should be denied as moot.

An appropriate Order is filed herewith.

**ENTERED** this the _9th_ day of August, 2010.

WILLIAM J. HAYNES, JR.
United States District Judge